163 So.2d 180 (1964)
Lessley BRADLEY
v.
HUMBLE OIL & REFINING COMPANY, successor to Esso Standard Oil Company, and Insurance Company of North America.
No. 1374.
Court of Appeal of Louisiana, Fourth Circuit.
April 6, 1964.
Rehearing Denied May 4, 1964.
Writ Refused June 30, 1964.
*181 Donald V. Organ, New Orleans, for plaintiff and appellee.
Lemle & Kelleher, Carl J. Schumacher, Jr., Dermot S. McGlinchey, David L. Campbell, New Orleans, for defendants and appellants.
Before McBRIDE, REGAN and CHASEZ, JJ.
REGAN, Judge.
The plaintiff, Lessley Bradley, instituted this suit against the defendants, the Humble Oil and Refining Company and its insurer, the Insurance Company of North America, endeavoring to recover the sum of $107,816.30 representing damages for personal injuries incurred by him as a result of the negligence of one of Humble Oil's employees in hosing him with gasoline, which subsequently caused his clothing to ignite and severely burn his body.
Defendants answered and generally denied all of the significant allegations of the plaintiff's petition.
From a judgment in favor of the plaintiff in the amount of $19,810.13, the defendants have prosecuted this appeal.
The record reveals that on August 23, 1959, plaintiff was riding as a guest passenger in an automobile driven in Jefferson Highway by his companion, David Clark. At about three o'clock p.m., when they were approximately half a block removed from the defendant's service station, plaintiff alighted from Clark's automobile to help align the bumper thereof with the bumper of a stalled automobile so that Clark could push the latter vehicle and thereby start the motor thereof. When the plaintiff reentered Clark's automobile his clothes, which had been saturated with gasoline, burst into flames, resulting in second and third degree burns of over 40% of his body.
From this point the evidence contained in the record becomes vague, nebulous and *182 quite conflicting. Plaintiff's version of the incident may be summarized as follows: On August 23, 1959, he and Clark departed from Baton Rouge and motored to New Orleans in order to visit an amusement park located here. When they left the park they met a group of friends who were occupants of another automobile and mutually they decided to make the return trip to Baton Rouge together. They drove from the amusement park to Causeway Boulevard, turning south and continuing to the overpass on that roadway. Clark, who was driving the lead car was unfamiliar with the area, and for that reason he failed to enter the west-bound descending ramp at the Airline Highway interchange. Instead, he descended on an exit ramp which placed them in the Jefferson Highway, a short distance removed from the Shrewsbury Esso Service Station.
Clark and the plaintiff drove into this station to request directions to Baton Rouge and to obtain gasoline for Clark's vehicle. During this time their friends in the other automobile waited on the shoulder of the highway. While they were in the service station, Clark visited the men's rest room and the plaintiff remained outside with the station attendant. In the course of servicing the car with fuel, the attendant allegedly spilled gasoline upon the plaintiff.
When Clark returned, he and the plaintiff entered the automobile and drove over to the highway where their companions were waiting. Since the other car, to reiterate, had stalled, plaintiff and Lawrence Williams, who was driving the second vehicle, got out to make sure that the bumpers were in proper alignment so that Clark could push the Williams' automobile. It was at this moment when the plaintiff re-entered Clark's automobile, that the fumes from his gasoline-soaked clothing ignited and almost converted him into a human torch.
The lower court, after hearing the witnesses offered by both plaintiff and the defendant, accepted the plaintiff's version of the incident and rendered judgment in conformity therewith.
The specifications of error enumerated by the defendants strike at the very heart of plaintiff's suit. Defendants insist that the plaintiff failed to prove that he was ever present in the defendant's service station on the day that the incident was alleged to have occurred; that he omitted to prove that the defendant's service station attendant actually hosed the plaintiff with gasoline; that even if plaintiff was hosed in the service station by one of the defendant's employees, such an act was not within the course and scope of the attendant's employment; and that the actual cause of the plaintiff's injury was his own negligence in lighting a cigarette while his clothing was saturated with gasoline.
To say the least, the evidence appearing in the record is not only conflicting but reveals many discrepancies. For example, the individuals working at the defendant's service station on the day in question flatly deny that any incident similar to that described by plaintiff ever occurred. Moreover, in the course of obtaining a deposition, plaintiff was confronted with six men and requested to choose from among them the service station attendant who hosed him with gasoline, but he was unable to do so. In addition, there are contradictions in the plaintiff's testimony which indicate that he may have driven from the overpass in a direction opposite to the location of the defendant's service station. Finally, there exists some very interesting evidence which tends to indicate that the plaintiff may, in fact, have caused his own injuries by lighting a cigarette while his clothes were saturated with gasoline.
However, assuming arguendo that the plaintiff's version of the incident is accepted as true, it is our opinion that he is nevertheless precluded from recovering. It is of more than passing interest to note that the plaintiff in his petition carefully asserted that the service station attendant negligently *183 spilled gasoline on him while servicing Clark's automobile. However, in the course of the interrogation at the trial hereof, plaintiff unequivocally and emphatically insisted that the attendant deliberately and maliciously hosed him with gasoline. The plaintiff very significantly testified in this respect as follows:
"A. He made the remark about my pants and shirt and asked where did I get them from and I told him from the store, and I turned to walk off and he mumbled something else and I turned around and he shot the gas on me.
"Q. Suppose you tell me about the pants and shirt. What kind of pants were you wearing?
"A. They was a brownish pants and a sport shirt.
"Q. The first thing this man says to you is, `Where did you get those pants and shirt?'
"A. That's all he ever say to me.
"Q. And the next thing he did was deliberately point a gasoline hose on you and shot it at you?
"A. After he mumbled something else.
"Q. And he pointed the gasoline hose at you?
"A. When I turned he pointed and squirted.
"Q. Had you said anything to the man other than you got the shirt and trousers at a store? That's all you had told him?
"A. Yes, sir; that's all I had said.
"Q. You hadn't done anything to this man?
"A. No, sir.
"Q. The man that sprayed you?
"A. No, sir. What reason I had to do anything to him when I don't even know him?
"Q. And he deliberately shot you with gasoline, you say, and you had done nothing to provoke him or otherwise disturb him?
"MR. ORGAN: If Your Honor please, I object to that because he's asking the plaintiff to state what was the state of mind of the man who was doing that, whether he did it deliberately or accidentally. He's asking this witness to state what some other person was thinking. Whether it was deliberate or accidental was the state of mind of the man doing the spraying.
(Argument on objection.)
"THE COURT: I think you should rephrase your question and ask him if it appeared to be a deliberate action; otherwise, the Court will sustain the objection.
"Q. (By Mr. Schumacher) Lessely, this man pointed the hose at you?
"A. Yes, sir.
"Q. And he pulled the trigger on the hose?
"A. Yes, sir.
"Q. And he pointed it at you high, about your neck?
"A. About along here. (Indicating.)
"Q. Your chest?
"A. Yes, sir. He did it and laughed about it, like someone was going insane.
"Q. And he did this just as you say? There was nothing else to it other than as you have described?
"A. I didn't say anything to him. I told him I got it from the store, the pants from the store."
In conformity with the foregoing facts emanating from the plaintiff himself, it is clear that Humble Oil cannot be held *184 liable for the actions of a service station attendant who hosed a customer with gasoline. While LSA-Civil Code Art. 2320 imposes liability on employers for torts of their employees committed "in the exercise of the functions in which they are employed", it is absolutely necessary that such a wrong occur in the course and scope of the servant's employment.[1] While a very liberal interpretation is afforded to the phrase "course and scope of employment" in the workmen's compensation cases, it is equally true that a more strict interpretation and construction thereof is applied in tort cases where a plaintiff is endeavoring to impose vicarious liability on an employer for personal injuries inflicted by an employee.[2]
An equally strict construction is used in cases where an employee intentionally or maliciously inflicts injury on third persons. A study of the jurisprudence pertaining to this subject clearly reveals that an employer is not vicariously liable merely because his servant or employee commits an intentional tort on the business premises during working hours. No vicarious liability will attach in such a case unless the employee acts within the ambit of his assigned duties and also in furtherance of his employer's objectives.
The foregoing rationale initially emanated in this state from the landmark case of Williams v. Pullman's Palace Car Co.,[3] wherein the Supreme Court refused to hold the defendant railroad liable for an assault committed aboard one of its trains by a porter employed to work thereon. The court outlined the responsibility of the employer as follows:
"The evidence in this case establishes that the porters employed in the defendant's service are mere menials, employed to clean up the car, and keep it in order, and to wait upon the passengers; having no police authority whatever, and no connection with the enforcement of the rules of the service, except to report violations of them to the conductor. Anything more completely outside of `the functions in which he was employed' than the assault committed on the plaintiff could hardly be conceived. If it had been his duty forcibly to prevent the plaintiff from entering the car, or to put him out at all, and in performing this duty he had used wanton and needless violence, inflicting injury, defendant might have been responsible. But he had no such duty or authority. * * * A person has a right to enter a bank for the purpose of collecting a check and to present it to the paying teller for payment; but if, on such presentation, the teller should leap over the counter and knock him down, surely such an act would not subject the bank to liability. So one may lawfully enter a store and deal with any clerk with reference to the purchase of goods, but if, on some dispute, the clerk should commit assault and battery upon him, the merchant would not be responsible therefor. Or if one, on lawful business, should knock at the door of any private house, and, on asking the servant who answered the call for permission to see the master, the servant should assault and beat him, would the master be responsible? Clearly, in all such cases, the lawfulness of the party's conduct, and the fact that the injury was received while he was properly dealing with the servant as a servant, would not suffice to bind the master, unless the latter had expressly or impliedly authorized the act, or had been guilty of some fault in knowingly employing so dangerous a servant."
*185 The foregoing rationale was again reiterated by the Supreme Court of Louisiana in the case of Hale v. Gilliland Oil Co.,[4] wherein the court denied recovery to a plaintiff who was shot by the defendant's foreman who became angry when he was awakened by the plaintiff to complain that someone had taken his bunk. The court rationalized as follows:
"He was not employed to assault or murder people, but to see that the employees were properly cared for in the bunkhouse, and suddenly turned away to vent his anger upon the plaintiff for purposes of his own. The employer was therefore not liable for his act."
On the other hand, the Courts of this State have not hesitated to impose liability on an employer where the intentional tort is committed by an employee as part of his assigned duties and in furtherance of his employer's objectives. For example, in Bearman v. Southern Bell Telephone and Telegraph Co.,[5] the court awarded damages against the defendant for the actions of a watchman in beating a child while protecting the company's property. In the case of Healey v. Playland Amusements,[6] the employer was held vicariously liable for the intentional tort of an employee committed while ostensibly preventing vandalism upon his employer's property.
The distinction between those acts which are considered to be within the course and scope of the servant's employment and those which are not so considered, is brought into bold relief by virtue of the rationale emanating from Mendel v. W. G. Coyle Co., Inc.[7]" In this case the defendant's employee violently chased two women who were stealing coal from the company. Plaintiff's decedent interfered with the employee's abuse of the women and thus angered the employee. When the women departed the employee returned to the spot and shouted at the decedent to "Come on down here now and steal some more coal." In the ensuing combat, the defendant's employee killed the decedent. The organ for the Supreme Court expressed the opinion that the employee was not acting in the course and scope of his employment when he returned to challenge the decedent. The court reasoned that since the women had departed from the area and had returned the coal which they had stolen, the employee's duty to his employer of protecting his property had ceased and the action of the employee in returning to the scene for the purpose of challenging the decedent was entirely a personal argument of the employee and was totally disconnected with the functions he had been employed to discharge. Thus, it is evident that in order for an employer to be held vicariously responsible for the tortious action of his employee, the employee must be acting in the furtherance of the employer's objectives and not seeking some objective of his own.
The duties of a service station attendant are to service the automobiles patronizing the station and to perform any other manual task assigned to him by his immediate superior. He is not employed to police the station, nor is the perpetration of practical jokes part of his work.
In view of what we have said hereinabove, we are of the opinion that the station attendant was employed to service automobiles and not to hose customers thereof with gasoline, and for this compelling reason we are convinced that his actions were not within the scope of his employment.
For the foregoing reasons the judgment of the lower court is reversed and plaintiff's suit is dismissed, at his cost.
Reversed.
NOTES
[1] Williams v. Pullman's Palace Car Co., 40 La.Ann. 87, 3 So. 631.
[2] Wills v. Correge, La.App., 148 So.2d 822 (1963).
[3] 40 La.Ann. 87, 3 So. 631 (1888).
[4] 151 La. 500, 91 So. 853.
[5] 17 La.App. 89, 134 So. 787.
[6] La.App., 199 So. 682.
[7] 153 La. 1056, 97 So. 38.